Case 09-1848, Wallace v. Leyshon v. Diehl Controls North America. May it please the Court, King IV, on behalf of Diehl Controls North America, Christoph Weihrauch. There are two fundamental issues in this case. The first is whether the words spoken in Mr. Leyshon's office on the day that he was fired are defamatory at all. And second, if the Court were to reach the issue of damages, is the $2 million compensatory award and the $6 million punitive award, are they grossly excessive, particularly in light of the Supreme Court's recent Slavinsky opinion? Recently, in Green v. Rogers, the Supreme Court stressed that a defamation claim requires, quote, particularity and precision. But the only words ever identified with particularity and precision in this case are the words spoken in Mr. Leyshon's office on the day that he was fired. On that day, Mr. Weigand of Diehl Controls told Mr. Leyshon that he was terminated. And three times, Mr. Leyshon asked him the reasons why. And three times, Mr. Weigand declined to say why. Only when pressed a fourth time did Mr. Weigand then say that Mr. Leyshon had been terminated for a cause under the terms of his employment agreement. Then Mr. Leyshon pressed further and demanded, quote, are you telling me that I'm being terminated for gross insubordination? And then he also listed three other grounds under the employment agreement. Now, none of these words are disputed. And none of these words are defamatory. Can I interrupt you for one second? Before the plaintiff expressed his incredulity at the statement and then asked if it was gross this, gross that, didn't, I think, is it Dr. Weigand? Didn't Dr. Weigand say it's for cause based upon the terms of the contract? That's correct, Your Honor. First there was a statement, you're fired, and a statement to the effect that you're being fired, and then another statement, you're being fired under the terms of your contract. And as to those words, terminated for cause, they can mean many things. But we do know this, that conjuring up the worst possible meaning, as the suggestion has been made in Mr. Leyshon's brief of sexual misconduct, is really completely contrary to the whole idea of the innocent construction law. The real question is, can these words, terminated for cause, be innocently construed? And this court in the Scott decision squarely answered that question with, yes, they can. But terminated for cause and the second answer of Mr. Weigand, yes to the yes or no question, both are not defamatory for another fundamental reason. And that is, there's simply no getting around the fact that these words would never have been said unless Mr. Leyshon had demanded that they be made public. And on this point, the restatement of torts and the case law are all unmistakable. When an employee is fired and demands that the reasons be made public, and the employer does just that, then there is no defamation as a matter of law. Mr. Leyshon's reasons to avoid this rule fall far from the mark. First, he argues that Illinois courts would reject the restatement. Section 583 on undivided defamation. But the restatement has been mainstream law, mainstream law for decades. Mr. Leyshon cites not a single case that has ever rejected the restatement, section 583. And what is more, the restatement is based on sound policy, on the basic principle that you can't recover for an action that you've consented to. So there's no real reason to reject the restatement. Mr. Leyshon also argues that there's no undivided defamation here. There would be no undivided defamation if he was surprised and didn't know the exact words that would be said. But that's not what the restatement says. The restatement talks about knowing or having reason to know. And what does that mean in the employment discharge setting? Well, the restatement gives us an example, a simple example of a teacher who has been discharged who then demands that the reasons for that discharge be made public. The restatement is very clear on this, but that's not defamation. And this illustration is really rooted in that same basic policy, and that is when the employee is told that he is fired, that's a stop sign. And at that point, the employee has a choice. He may ask to discuss the reasons for the termination privately, but if for any other reason he decides, for whatever reason, to demand that those reasons be made public, then the employer is entitled to answer that public challenge, in public, without being liable for defamation. Finally, Mr. Leyshon argues that his questioning falls within the honest inquiry exception to the restatement. At what point did you raise this issue of the invited defamation? This was raised in our post-trial motion, Your Honor. As a result of that, is not that argument forfeited?  First, the whole issue of this exchange, the questions that were raised, those were not in the original, those were not in the complaint. The complaint alleged a different set of alleged defamatory words. So these were not in the complaint that Mr. Leyshon went to trial on, did not contain the questions that gave rise to invited defamation. So this is not something that could have been raised in an answer. The second reason is that whether words are defamatory is a question of law. Particularly in this case, it's not disputed what was said. And there's no dispute about the scope of that consent. And so Section 1202 of the Code of Civil Procedure very clearly says that an issue that even if there is no motion for directed verdict, still a motion for judgment, JNOV, as we have here, preserves that issue for appeal. It is a question of law, and that's what we have here. So for those two reasons, this issue has been preserved for appeal. Counselor, can you explain to me the question of law? Are you referring to the innocent construction law? What I'm referring to primarily there is the question of invited defamation, Your Honor. In this case, there's no dispute about what was said on the day that Mr. Leshon was terminated. And so courts have time and again held that the question of are particular words defamatory, that's a question of law for a court as opposed to if there was an issue about what was said or who said what or the like. So the whole question of invited defamation in this case, where there's no issue about what was said, that's something that courts have decided as a matter of law. And I would offer two of the cases that we said in our brief. The Charles case from the Court of Appeals in Florida decided this very issue as a matter of law, as did the Williams case from the Supreme Court of Missouri. Both of those courts relied on Section 583 of the restatement. There was no issue about what was said, and they both held as a matter of law, both in the Charles case and in the Williams case, that there was no defamation because in both cases the employee had clearly requested and demanded that the reasons be made public. When you say no defamation, it's not really that the statement, you're not saying that as a matter of law the statement, and I'm just talking about now you're inciting defamation, the statement as a matter of law. I'm getting a little confused because you're saying that there's no cause of action for defamation as a matter of law. How the courts have described this is that consent or invited defamation really takes away the element of publication, which is one of the essential elements for defamation. And the Charles case in particular has a very good discussion of the fact that this is not publication if it's been invited or consented to. So that's what we're talking about when we're talking about an issue of law. So when you're using the word defamation there, it's the cause of action more than saying that the statements are not defamatory as a matter of law. That's absolutely right. There is no cause of action. In that case, and this is an important point to emphasize, courts assume that these words are false in that sense. They're false, but they're consented to in that sense. They take that for granted that they are false, and they also assume that malice doesn't take away the consent. So that's what they're referring to. Okay, thank you, Counselor. I wanted to return to the final reason that I was speaking about, the honest inquiry exception to the restatement. Counselor, let's look again at the invited defamation before you move on. It's true that the jury basically found that there was no misconduct of the plaintiff in this case. And so as such, then even honest marriage, this idea of invited defamation, that type of defense, would not have been successful. Isn't that correct? I mean, first of all, you've got a problem with the fact that it's forfeited. And then secondly, looking at the facts of the requirements of invited defamation, honest marriage, it also would not prevail here in this particular case. Why would you see differently? Well, Your Honor, if the question is, was this a question for the jury to decide? No, no. I mean, the jury, as far as I'm concerned, looking at this case, that the undisputed facts show that the plaintiff was seeking a reason for his termination. That's what he was making an innocent inquiry. And the jury didn't find that he had engaged in any kind of misconduct. So, therefore, it would seem that even on the merits of this case, even if we allowed you to forfeiture, which I'm not sure that you've completely explained your way through yet, the invited defamation defense still would not have been successful. Well, as to the question of whether there was any misconduct by Mr. Lashen, we're not suggesting any misconduct. What we're saying here is that he invited these words and that the idea that this was an innocent inquiry under the restatement really doesn't fit here because the innocent inquiry has to go to whether you're asking, you need to know the who or the what about an earlier defamation. That's the key. But the restatement says specifically an honest inquiry or investigation by the person defamed to ascertain the existence, source, content, or meaning of a defamatory publication is not a defense to an action for its republication by the defamer. And the key there, Your Honor, is that, and it goes on to talk about that the inquiry has to be about an earlier defamation. And in this case, Mr. Lashen was fired, was terminated by Mr. Vigon before he ever uttered any defamatory words. So in this case, he already knew that he had been terminated. There was no earlier defamation to inquire about. In this case, he knew he had been terminated. And he wanted to know why. And so he asked why. And when he asked why at that point, that's the point, that's when we get back to illustration two of the restatement, which fits this case almost exactly in the same way that the Charles case did. And that is, when you're told you're terminated, and this goes back to the illustration of how it fits so perfectly here, when you're told you're terminated, that is, that's the stuff. You're entitled to know why you're terminated. Well. And you're saying that the simple asking why, you know, equals invited defamation. Yes, and that's the. What case in Illinois upholds this theory of invited defamation? Well, there has been no case in Illinois that has applied to Section 583. But as we've said in our briefs, the restatement illustration fits this almost exactly. The Charles case and the Williams case fit this almost exactly. And the idea is that this is not a situation where it's unclear what's happened in terms of. . . One of the other cases where an employee is asked, well, you're told you have a problem. And the employee says, well, what do you mean I have a problem? This is after he's left. He says, well, you've been stealing. This is fundamentally different. And this is the whole point of the illustration, illustration two in the restatement, which focuses on termination and the importance that once you know you're terminated and you know who's terminated you, you have a choice to either have that discussion privately. But if you insist on having those reasons made public for whatever reason, then you have put yourself at risk of a defamatory answer at that point. And that's the whole point of that illustration two. You need to go to your last point. Your Honor, so for this reason alone, the judgment should be reversed. But we also, as the Court knows, have two issues on the damages part of this case. And first, and that is that the $2 million compensatory award is grossly excessive, as are the punitive award. The $2 million compensatory award cannot be based on just the words spoken in Mr. Lashon's office. And he doesn't contend that they are. He must rely on words beyond his office, but there's absolutely no evidence of any defamatory words spoken outside his office. He's left with what he's referred to as a somehow it got out there. But that's completely at odds with the Supreme Court's recent decision in Green, which emphasizes that defamation requires particularity and precision. And at most we have here are vague claims about circumstantial evidence. But as it turns out, that circumstantial evidence is nothing more than unreturned phone calls. And that's not evidence of anything. People might not return a phone call for any number of reasons that have nothing to do with defamation. As to the expert that testified here, he didn't identify any defamatory words. And if there really was defamation outside the office, then one or more of Mr. Lashon's many contacts would have testified to something defamatory, and not one ever came forward. What about Mr. Wyden acknowledging that he told the executive recruiter that Mr. Lashon's termination was sudden? Well, the only thing that he told the recruiter was that he was terminated, and terminated suddenly, and he was difficult to steer. And as we've noted in the brief, just saying that someone is terminated, that's not defamatory. And simply saying someone has been terminated suddenly, that's not defamatory. And there's no other words. Don't you have to consider the context where this gentleman was working and the atmosphere, the environment, what was routine and accepted in the arena where he worked in terms of whether or not someone being terminated suddenly would mean, for a cause, would indicate something either involving theft or moral turpitude? That's the environment in which he worked. Well, there's absolutely no evidence that anyone, either Mr. Vigon or any of his colleagues, said anything outside of the office on that day, and there's no evidence in the record. Even the statement to the recruiter is a statement that he was terminated. And later on, if there really was some vendetta to spread defamatory words, that's completely contrary to the idea that they even offered a letter of reference, which he declined, but there's simply no evidence. But the expert says that if you terminate someone for cause, in his opinion, that this gentleman would never be able to find another executive position. That's what Mr. Sababro testified. What he testified, it's important to look carefully at what he said. He said that the difficulty in finding a job could arise from any number of reasons that are unrelated to defamation. It could be because of his age or just the fact that he was terminated, whether it was for cause or not for cause. And the expert was not put forward as an expert as to whether there was defamation. He was there just to talk about mitigation of damages, and he never identified any evidence at all of anyone saying anything defamatory outside the office. And that just gets back to the Green case again, and that's where the Supreme Court's emphasized that without particularity, without some kind of precision, a defendant has no idea of what they're accused of, and that's just as in this case. It's fundamentally unfair to defend against a defamation claim, in this case when there's no evidence at all of who said what to whom. Finally, I'd like to turn to the punitive damages. The trial court did not have the benefit of the Supreme Court's recent decision in Slavinsky, which should now be our guide in talking about any punitive damage award. There's some strong similarities between this case and Slavinsky. As in Slavinsky, Mr. Leshon was fired before any defamatory words were spoken. And in Slavinsky, even with its statements about slacking off and chasing women and the like, none of which were invited, the Supreme Court still came out and found that the proper award of punitive damages for that type of conduct and those types of words was about $82,000. Counsel, I think that the law in Illinois is that an award of punitive damages is not going to be reversed unless you show that it was a result of passion, of corruption, of partiality, and where is the evidence of that? Well, in this case, Your Honor, the Supreme Court focused on... And that's blunt. Pardon me? Blunt speaks to that. Yes, it does, in terms of passion and partiality. In this case, we would suggest that when the award is $6 million and that for words that are not that different from what was said in Slavinsky, an award that's 73 times greater, that that by itself shows there was some influence that went beyond simply trying to have the crime fit the punishment here. And that's what Slavinsky is all about, is gauging reprehensibility and weighing reprehensibility. And when you have a situation where there's no physical injury, there's only evidence that these words were spoken once. There's no evidence of any other time when these words were spoken. Then when you put all that together, as the Slavinsky Court emphasized, the correct amount was in the range of $82,000. So in terms of gauging these numbers, obviously it's not a scientific determination, but when you have the court, this court in Slavinsky, remitted the $1 million punitive award for defamation to $82,000, and the Supreme Court then found that that was the proper course in Slavinsky to remit it to that amount. Thank you, Your Honor. Thank you, Your Honor. May it please the Court, Constantine Trella on behalf of the plaintiff, Wallace Lation. Before getting into the details of defendants' arguments, it may be helpful to make clear exactly what's not at issue here, and some of that has come out already. Basically, the defendants don't dispute that their statements concerning the reasons Ms. Lation was terminated were false. They don't dispute that the statements were made with actual malice. Although they dispute that they caused economic harm, they don't dispute that they caused impersonal harm, namely emotional distress and humiliation. The fourth point that is not in dispute is that immediately after terminating him and making the defamatory statements, Defendant Vigand and other deal officers arranged meetings with Mr. Lation's customers to discuss his departure. And I'll talk about that in a little more detail later. And finally, although they dispute the amount of punitive damages, as you just heard, they don't dispute the punitive damages are appropriate for the kind of conduct at issue in this case. Now, when you view this case against the backdrop of these things that are not disputed, defendants' claims that a great injustice has been done or that Illinois law has somehow been turned upside down just fall flat, and the broad issues that they want this court to decide really are not presented here. What this case is really about is a businessman who had a 30-year career of stellar performance. Since joining Diehl in 2001, he had nothing but excellent performance reviews and expanded responsibilities and a new three-year contract in January of 2005. Shortly after that, he raised questions concerning aggressive tax practices at the company, practices that Defendant Vigand devised. And then everything changed. The defendants thereafter spent the better part of the next year trying to craft a plan to get rid of Mr. Lation, and not just to get rid of him, but to get rid of him in a way that would enable them to avoid their contractual obligations, and that's a plan that could only succeed if they manufactured false and defamatory reasons for terminating him. And a properly instructed jury, an attentive jury, as Judge Burke described it, found that that's exactly what happened here. Now, Mr. Poore raised several arguments to try to avoid the consequences of this conduct. The first one is that there were no defamatory statements made at all. I think defendants make a couple of fundamental mistakes in presenting that argument. First, they try to carve out the for cause piece of the statement and treat that in isolation as if it's the only thing that was said and as if it was said in a context that provided no insight into its meaning at all. And then they read this court's decision in scope as if it announced some sort of a blanket rule that for cause can never be defamatory under any circumstances and regardless of context. Now, what happened in Mr. Lation's office in February of 2006 was not, as defendants try to portray it, this series of disconnected separate statements. What happened was this was really a continuous and probably rather heated conversation. Vigan told Mr. Lation he was fired. Mr. Lation asked why several times. Vigan said he was terminated for cause. Mr. Lation, who was stunned, said, you've got to be kidding me. Vigan responded by saying, you are terminated for cause under the terms of your employment agreement. So it was Vigan, not Lation, that brought up the agreement. Then Lation followed up on Vigan's reference to the agreement and said basically or asked, you're telling me you're terminating me for gross insubordination, a violation of law, et cetera. Vigan said yes and repeated again the deal was convinced that they had sufficient grounds under the contract, sufficient cause under the contract to terminate him. Then they, to add to the context, then they immediately, they seized his computer, they seized his office keys. Someone then, Mr. Lation, invited someone else in to hear. Yes. Let's get this. Yes. I'm glad you asked, Ronald. Let me get the sequence correct. The session started out with Vigan, Kramer, who was another deal executive, and Mr. Lation. With those people in the office, Vigan said you're fired. Lation asked why. Vigan didn't answer. Then Lation went out and got Dugan, who was a human resources employee at Diehl, and asked him to come in, perfectly logical since he was a human resources employee, and then the rest of the conversation occurred in the presence of both Kramer and Dugan. So the court clause wasn't said until Dugan came in, and neither was the willful misconduct and the rest of it. So the innocent construction rule, which is what defendants are relying on here, applies only where a statement considered in context and given its natural, yes. Can I ask, I'm sorry to interrupt. No, not at all. Here's my issue with the raising of the innocent construction rule as it relates to the jury verdict. You both sides seem to agree that it's a question of law, the innocent construction, that needs to be decided by the judge. I think that's what I understand. The case law is decided by both sides. And it says that it should be decided initially by the trial court. So I'm having trouble seeing how this innocent construction rule applies to assessing the correctness of the jury verdict. Do you understand my question? I think I understand. I think that the innocent construction rule does not – I think when you're at the point where you're looking at the jury verdict, the innocent construction rule at that point is irrelevant. I think it's basically a two-stage inquiry. I think to raise the innocent construction rule, what the defendants are basically saying is this case should never have gone to the jury because of the innocent construction rule. Once it's at the jury stage, then it's up to the jury whether it was defamatory or not. So that issue of innocent construction could not and was not presented to the jury? No, not in those terms. I believe the jury was presented with, you know, was the statement defamatory, did it tend to harm him, that sort of thing. So implicitly, you know, I guess innocent construction is in there, but not in the terms in which the rule is formulated in the case because that initial determination, you know, basically is there enough to go to the jury, is for the judge. Which Judge Burke did on a motion for partial summary judgment, is that correct? You know, I don't remember exactly how the defendants raised that. I think it was a motion for partial summary judgment. Was it raised in a motion for directed finding? I don't believe so. But it was raised in the motion for judgment? Yes, no, they did raise the innocent construction rule prior to the case going to the jury in some fashion. Thank you, counsel. Sure. So in applying the innocent construction rule, the court has to interpret the statements as it appears that they were intended and is not supposed to strain to find an inoffensive, innocent meaning. Now, applying those standards, Judge Burke here was clearly correct in submitting the defamation claim to the jury. Defendants don't suggest any possible innocent construction for the statements that Mr. Lation was guilty of gross misconduct, gross insubordination, willful violation of the law. There's no possible innocent construction for that part of what they said. And there's no dispute that they intended to convey a defamatory meaning. Both Weigand and Neugebauer, another senior deal executive, admitted that they knew they were making very, very serious allegations of misconduct against him. So the natural and obvious defamatory meaning of the statements, moreover, was confirmed by the rest of the context, seizing his keys, rifling through his files, telling him, you know, gather up your pictures and your other things and get out of here. So when you look at all that in context, as the Supreme Court has repeatedly said you should, the innocent construction rule just does not apply here. And this, were you about to say something? I was just going to say that just listening to the earlier counsel's argument, this is where the invited defamation would come into play. Right. And let me turn to that then. First, as I think Justice Hall asked, there's clearly a forfeiture here. The defendants never suggested prior to or at any time during trial that Mr. Lashen could not pursue a defamation claim. He somehow invited or consented to the defamation. Mr. Poore referred to some problem with the complaint, and they didn't know what was in the complaint, so they couldn't raise it in the answer. Well, first of all, there's no issue here presented on the pleadings. There's no dispute that the complaint is sufficient. Second, we're talking about at trial. It was crystal clear at trial what they were being accused of, crystal clear of what the sequence of events in the office was. So if they had an invited defamation defense, a consent defense, that clearly could have and should have been raised at that time. Judge Burke himself in the post-trial motions, when he was considering the post-trial motions, he noted that the issue had not been raised, and he said, I don't want to call a waiver, but then he proceeded not to decide it because it wasn't properly presented, and they haven't suggested that Judge Burke was off base in that regard. That's at pages 24 and 25 of the appendix to the appellant's brief, by the way. I would assume that discovery had been disclosed. Exactly. This was not a – whatever they want to say about the complaint, and again, the complaint's not an issue here. By the time of trial, this was all crystal clear. The law is very clear that defenses like consent can't be raised for the first time after trial. In fact, the defendants themselves recognize that because they raised a qualified privilege defense at trial. They asserted it at trial, they requested a jury instruction, the jury was instructed, and the jury rejected it. There is no reason why this invited consent defense should be treated differently than qualified privilege or any other issue like that. To the contrary, where invited defamation is recognized as a defense, and Illinois is not one of those states that I'll talk about in a moment, it requires the resolution of a variety of factual issues as to whether consent was actually given, the scope of the consent, and whether the publication may have exceeded the scope of that consent. Mr. Ford talked about, well, there's no dispute here about what was said. Fair enough. We have clear testimony about what was said. But what we don't know is we can't make the determination as a factual matter whether there was consent. The restatement itself, comment C, for example, says the consent is to be determined by, quote, reasonable inferences from the conduct in light of the circumstances surrounding it, close quote. Reasonable inferences from the conduct. That's a factual question. That's not something a court does as a matter of law. And so here it just makes no sense to allow a defendant to sit silently through all the pretrial proceedings, sit silently through the trial, wait for the verdict to come in, wait for the jury to be discharged, and then months after the trial suddenly raise an issue that presents factual issues and ask the court to throw the case out based on that. Counsel has indicated, I'm sorry, that it's a question of law. It's clearly not a question of law. I think it's clear under the restatement that there are to determine whether there was, in fact, consent. And, again, we're talking about states where it's recognized, and I don't think that's Illinois. But where it's recognized there are factual issues to be resolved. Was there consent? What was the scope of the consent and that sort of thing? And here that issue was never presented to the jury as Judge Burke recognized. Now let me talk about the substance of that defense. Mr. Poore said, well, there's no Illinois case that has rejected Section 583 of the restatement. I would say it the other way. There's no Illinois case that has accepted Section 583 of the restatement. In their opening brief, the defendant did cite an Illinois case, Heller v. Howard. But that case makes it clear that to the extent that there is any consent defense in Illinois at all, it applies only where the plaintiff consented to a repetition of a previously made defamatory statement. There is no support in Illinois law whatsoever for a consent defense where the defamatory statement, as is the case here, was made for the first time in response to a question from the plaintiff. So in their reply brief, the defendants abandon Heller, and they rely on 583 and some out-of-state cases. But the out-of-state cases in Section 583 don't help them either. The problem for them is that it's clear under the restatement, and Comment D to Section 583 makes this clear, that to find consent, the evidence must show that the plaintiff either knew the exact language of the publication or at least had reason to know that it may be defamatory. And really, when you think about it, it's only logical. You can't consent to something. You can't invite something if you don't know what's going to happen. And when you're making an honest inquiry about the reasons for something, unless you have some reason to think it's going to be defamatory, the restatement provision simply does not apply by its terms. And that's clear from the case. The plaintiff must know the language of the publication. Surely the plaintiff was familiar with the language of the contract. The plaintiff was familiar with the language of the contract, but the plaintiff did not know that he was being terminated until he was told. He didn't know he was being terminated for cause under the terms of the contract. That came right from Mr. Vigon. And then Mr. Lation made the honest inquiry. He said, wait a minute, you mean you're telling me that you think I did this? And Vigon could have told the truth and said no, but he didn't. He said yes. And I think that really highlights the – I think there's an important policy question here. Mr. Poore was talking about policy questions. The policy question here, at least the way they want to – they're asking this court to adopt this invited defamation defense for Illinois, is what they're saying is any time somebody makes an honest inquiry about some sort of a decision, in this case an employment decision, they're basically giving the other party an absolute license to defame, to say anything at all that they want, no matter how outrageous, no matter how false, no matter how harmful. And there's just no – to the extent that there's any policy presented by that case, that's the policy, and there is no support in Illinois law for adopting that kind of a policy. So why should this not be the instance where Illinois law is changed or invited defamation should become part of the law in this case? Precisely for that reason, Your Honor. And I want to draw a distinction between what I think the restatement actually says and the way the defendants are pitching it. The restatement does not say any time you ask a question, you're exposed to whatever the person might feel like saying. And then there's an absolute – and it's important, I think, to note that they're saying this is an absolute defense, that even if there's actual malice, even if there's intent to harm, it doesn't matter. You're still exposed to this. I think what the restatement is actually saying is if you know what's going to be said or if you have some basis for thinking that something defamatory is going to be said, then there's a defense subject to the proof that you have reason to know and all of that, the factual issues. What they're asking you to do is to say basically any time an employee is surprised and asks, well, why am I being discharged? Then it's just a license to the employer to say whatever they want to say without any basis in fact, with intent to harm, without intent to harm, with recklessness, what have you. And to adopt that kind of a rule for Illinois, I respectfully submit, makes no sense whatsoever. There is no sound public policy served by that kind of a rule. And really when you look carefully at the cases, and we try to explain this in our brief, and I will concede that there are some exceptions where the court didn't really seem to, at least didn't identify the evidence indicating that the plaintiff had some reason to know and the Charles case that Mr. Thorpe repeatedly mentioned may be one of those. But in virtually all of the other cases, there was some basis for the plaintiff to know that there's some reason to expect a defamatory response. In the Williams case, for example, which he cited, there was a termination letter sent, and the plaintiff basically came and said, well, I want to know why. I want to go to the board meeting or hearing, and I want to find out why. The plaintiff showed up with her lawyer. So, you know, it's pretty fair inference that she knew something was up from that. And the other cases all have facts very similar to that. Let me turn, if I might, to the damages question. Let me just say one more thing on this. There is absolutely no dispute that Mr. Blation, in fact, was surprised here. And not only was he surprised, but Mr. Kramer, the person that Vigand had invited into the meeting, and he was a deal insider. He was part of the management team from Germany and all that. He, too, was surprised. He said he was surprised, and Blation testified that he sat there in stunned silence until he was told to go through Blation's files. So whether he was genuinely surprised or expected this is not even an issue. Now, turning to damages, first of all, the standard here is abuse of discretion. They asked Judge Burke to reduce the damages. He considered that. He didn't do it. He felt the evidence was sufficient. And to overturn that, they have to show that he abused his discretion in making that decision. They can't do that for several reasons. First, the record contains substantial evidence of emotional distress and humiliation. They don't address that at all. There's no dispute under Illinois law that compensation for that kind of personal harm is an important component of a defamation recovery in a case where an individual has been defamed. And obviously that's what we have here. Their main argument is that there is no basis for inferring, as the jury and Judge Burke did, that defendants spread their defamatory statements beyond the confines of the office. That argument, I submit, just ignores the evidence. The record at trial established that Mr. Blation had an outstanding reputation in this relatively small industry. He was on a first-name basis with the senior executives of all the major firms. His contacts in the industry were such that at the beginning of his involvement with Diehl, he was able to set up more than 45 meetings with people in the industry to explore Diehl's interests in coming into the business, including companies like Maytag and Frigidaire and the like. Once he was at Diehl, he was able to use those same contacts to land these companies as customers for Diehl. Then when Diehl and Vigan formulated, they actually had a written procedure for getting rid of Mr. Blation. That's Plaintiff's Exhibit 33 is the documentation of that. Two key components were, first of all, to call the termination a termination for cause so they could avoid paying him, and Neugebauer admitted that in his testimony in Transcript 664 and 665, and then to promptly, as Vigan put it at trial, talk to, quote, all the customers that Wallace Blation had relationships with. That's Transcript 1172. Counsel, the court did change the amount of the damages from $10 million to $6 million. Yes, he reduced the punitive damages. I will talk about that. With the court's permission, I'll just try to wrap up quickly on compensatory damages, and then I'll touch on punitives. In fact, they implemented their plan perfectly. They called it a termination for cause, and then within the next few days after the meeting in the office, Vigan, Neugebauer, and other deal executives arranged meetings on short notice with Blation's customers, admittedly to meet with them to discuss the fact that Blation was out. They identified that some of the customers, at least, they talked to with Whirlpool, Maytag, Electrolux, and others, both in their testimony and in a meeting that Vigan had with the executive recruiter that the court referenced earlier. So this isn't a case like... So you're disagreeing with your opponent that, you know, they told absolutely no one about the termination. Oh, I am absolutely disagreeing with my opponent. There's no question that they met with and talked to customers in the days following Blation's termination. In fact, Neugebauer flew from Germany for that express purpose. Plan 633 spells out that that's what they were going to do. Now, it's true that we don't know exactly what they said in those meetings, but the inference that they repeated, the substance of their defamatory statements is very, very strong. Their story is, as Neugebauer and Vigan said, gee, none of the customers asked, and we didn't tell them why Blation was gone. Now, that the jury didn't believe that nothing at all was said about the reasons for his departure... Counsel, your time is far spent. I want to know how you can justify $6 million in punitive damages. Let me talk about that. Do that. The reason, and I also want to talk about the differences between this case and Slavinsky, but let me address your question directly. The evidence here showed a longstanding, carefully planned scheme to harm Mr. Blation due to a personal vendetta. Vigan's anger with him, which was specified to a trial about the tax issue, and the desire to avoid their contractual obligations. That scheme included as an essential component the fabrication of these defamatory reasons for terminating him, reasons that were admittedly false, knowingly harmful, and statements that were made with actual malice. None of that is disputed. The plan included promptly contacting his customers, as I just mentioned. It also included multiple acts of deception over the course of many months. And just to take one example, they had Blation present a long-term plan for spelling out his vision for the future of the company at the very moment when they were deciding that he was going to be out within the next few weeks. And Vigan admitted that he had Blation present that plan for the precise purpose in order to conceal the termination plot. By deceptively concealing the scheme, they were able to implement the termination and the defamation suddenly and without warning in a way that would inflict the maximum emotional, personal, and economic harm on Mr. Blation. And it was accompanied by threats by Vigan to use Diehl's ample resources to fight Blation to the extent that he tried to get any redress for this. Now, the scheme succeeded in causing substantial harm. And even after the scheme was exposed, they continued trying to blame Blation for their own misconduct. I submit, Your Honor, this is precisely the kind of conduct that the remedy of punitive damages exists to punish and to deter. Now, Slavinsky was very, very different. First of all, Slavinsky was decided, the liability part was decided on a default judgment, and there was only a trial on damages. The Supreme Court in Slavinsky noted that the jury was presented with only minimal evidence, that's a quote, concerning the defendant's conduct and absolutely no evidence of any pre-defamation events that supported the plaintiff's claim that there had been a premeditated scheme to harm him. There was also no evidence at all of any financial motivation for the defamation. There was no connection between the defamation and the plaintiff's termination. And the jury in that case found only minimal harm to the plaintiff. There was no economic harm, no harm to reputation, and only $80-some thousand in emotional distress-type harm. The record here is completely different. The jury here was presented with substantial evidence concerning the defendant's conduct, including the months of scheming and planning that went into the defamation and the termination. And there was also evidence that their motivation for this was precisely to avoid their financial obligations. In fact, Judge Burke, when he made the decision saying, well, $10 million is more than I want to approve, but $6 million is acceptable, he expressly referenced the evidence of, quote, what transpired before the termination in approving that award. So just in a word, all of the evidence that the Supreme Court in Slavinsky said was missing, the evidence that they felt was necessary to support a punitive award, that evidence is present in this record. Counsel, where is the emotional distress? Where is the humiliation? Where is the proof of the harm to the plaintiff that usually obtains in instances when punitive damages of this amount are allowed? Well, Your Honor, there was undisputed evidence by Ms. Relation and his wife at trial that it caused him great humiliation, emotional distress. There was testimony that he was pale and visibly shaken in the aftermath of this. And there was no contrary evidence at all. So we have that. And then in terms of economic harm, as I was explaining, there's substantial evidence that this defamation was spread and Mr. Relation's expert made clear that the fact that his calls and his efforts to find new employment went basically unanswered was a sign that this defamation had been spread. There was no contrary evidence. So there was substantial evidence of both personal harm and economic harm, Your Honor. But, you know, I'm not suggesting there was physical harm. I understand at least part of what Your Honor is getting at. There was no physical harm. There's not medical evidence. No medical evidence. No medical evidence. The testimony on emotional harm comes from Ms. Relation and his wife. No physical, psychiatrist, you know. Correct. No evidence of that, Your Honor. If the court has no further questions, I'll thank you for your time. Thank you, Counsel. A short rebuttal. I'd like to address a few points quickly, Your Honor. First on the waiver issue. We all agree what was said in terms of what is consent. The consent here are the words that no one disagrees about. That is, why was I terminated? And then the question of the yes or no question, do you mean I'm terminated because of gross insubordination. Those are all, that establishes the consent here. The question is, why didn't you raise this earlier in the trial as opposed to post-trial? Well, it could have been raised in a motion for directed verdict. It was not. But the Code of Civil Procedure in Section 1202 says, even if, I think the language is, you may move for a motion J and O B, even if, even though there's been no motion for directed verdict. Directed verdict motion could have been made on this. For whatever reason, it wasn't. But the fact that it was raised in a motion for J and O B under Section 1202 says maybe that's not the ideal way to do it, but it's still preserved for appeal. Was the motion for directed finding, would that have been equally untimely if it's a question of fact, as counsel suggests? If it truly was a question of fact, then that would be a different situation. But for all the reasons we've maintained, when you know what has been said, there's no dispute about that. And in this case, it can be decided as a matter of law. Then if it's raised as a matter of law after trial, then that's sort of the safety valve of Section 1202, which says, even if you didn't raise it in a motion for directed verdict, you can still raise it in a motion for J and O B. As to invited defamation, I would like to just urge the Court to read, ask the Court to look at Section 583's illustration number 2. That, once again, has been the law not just in Florida, but it's been mainstream law. And we've observed time and again in the courts of hell that if you know you've been terminated, this case goes one step beyond that. Because here, Mr. Lashon is told, you're terminated for a cause under your contract. And when he hears those words, he knows exactly what that means. He knows it so well that he can basically repeat back, do you mean I've been terminated for gross insubordination, gross misconduct, gross negligence? He knows exactly. He doesn't need to make any inquiry at that point. He knows. He knows exactly what that word means, that term means. As to the compensatory damages, I just want to be clear on this. We're not saying that no compensatory award is appropriate here. Some compensatory award is appropriate if the court were to reach presumed damages, because presumed damages presume some damages for emotional distress or injury to reputation. But our point here is that the only injury here is what was said in the office, and that cannot support a $2 million bridge to retirement. That, in effect, gives him salary every year until retirement. And the only way to support that is that if there is some kind of identifiable defamation outside the office. We can talk about, well, Mr. Neugebauer, Mr. Weigand, that was the customers. Of course they did. They had to. They had to tell him there was going to be this transition. If they said something to the effect that Mr. Lechon has been terminated, that's simply not defamation. And just to presume that they said, well, Mr. Lechon has been terminated for gross insubordination, there's absolutely no evidence of that. And we would expect, if that was true, if that really was true, that one of these customers would have come forward and said, yes, I heard this. But no one came forward and said that. We need to wrap up, counsel. And finally, on the punitive damages, Selvinsky really is the centerpiece here in terms of the question, was there a premeditated scheme to defame? In this case, the jury found a wrongful termination. Mr. Lechon has been compensated over a million dollars for that. The question is, was there something beyond the wrongful termination in terms of a scheme, a plot, premeditated to defame him? And in this case, when he walks in and says, you're terminated, does not give any reasons, not once, not twice, but three times, resists saying anything, we submit that's the opposite of a scheme to defame. Certainly the jury found he was wrongfully terminated. So for those reasons, Your Honor, when the Illinois Supreme Court found that a million was too much, certainly six million would be too much in this case. Thank you. Thank you, counsel. This matter will be taken under advisement.